IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID DIKE,<br><br>v.<br><br>THE PENN INSURANCE AND ANNUITY COMPANY | CIVIL ACTION<br><br>NO. 17-1410 |

Baylson, J.                                             January 10, 2018

## MEMORANDUM RE: MOTION TO DISMISS

In this case, Plaintiff David Dike ("Dike") alleges that Defendant Penn Life and Annuity Insurance Company ("PIA") committed various torts and statutory violations in the course of Dike's relationship with PIA as a PIA life insurance policyholder. Specifically, Dike alleges negligence, fraud, violations of the Texas Insurance Code, and violations of the Texas Deceptive Trade Practices Act. Presently before the Court is Defendant's Motion to Dismiss all of Dike's claims. Dike's claims are as follows:

    Count I. Negligence

    Count II. Negligent Supervision

    Count III. Fraud

    Count IV. Violations of the Texas Insurance Code

    Count V. Violations of the Texas Deceptive Trade Practices Act

For the reasons discussed below, Defendant's motion is granted in full. Counts I-III are dismissed with prejudice, while Counts IV and V are dismissed without prejudice, with leave to amend.

I. **Factual Background**

The following facts are taken as true from Dike's Amended Complaint. In 2009 David Dike approached PIA about the possibility of purchasing a Flexible Premium Indexed Life Insurance Policy ("the Policy") from them. (ECF 8, Amended Complaint ¶ 7.) PIA's agent William J. Talbot explained to Dike that the Policy required him to pay an initial cash premium, to be followed by yearly cash premiums which would be invested by PIA; the returns would then be paid out to Dike as policy loans, as well as additional tax-free income for the remainder of Dike's life, in addition to funding the life insurance policy and a long-term care policy. (Id. ¶¶ 8-9.) Dike expressed a preference to avoid negative tax consequences, such as those that would be created by a Modified Endowment Contract ("MEC"), and Talbot "expressly represented to [Dike] that a reduction in the Policy's death benefit was an appropriate investment consistent with [Dike's] investment goals, including, without limitation, avoiding the creation of a MEC." (Id. ¶ 10.)

In 2010 Dike purchased the Policy and paid an initial premium of $100,000. (Id. ¶ 11.) He later agreed to pay biannual premium payments of $50,000, which would be returned to him as policy loans for a 10-year period with an annual retirement benefit of $20,000-$22,000 tax-free. (Id. ¶ 12.) In October of 2012, Dike told Talbot that he wanted to begin receiving income from the Policy sooner than previously arranged, and reminded Talbot that he wished to avoid any changes to the Policy that would create an MEC. (Id. ¶¶ 13-14.) Talbot assured Dike that he would be careful to ensure that any changes to the Policy did not create an MEC. (Id. ¶ 15.) Talbot consulted with Wayne Stevens, another PIA employee, who recommended a reduction in the Policy's death benefit to increase the amount of Dike's premium that could be devoted to investment. (Id. ¶¶ 16-17). Talbot asked Stevens how much Dike could reduce the Policy's death

benefit without creating an MEC, and Stevens suggested reducing the death benefit to $626,000. (Id. ¶¶ 18-19.) Talbot, in turn, suggested to Dike that he reduce the Policy's death benefit to $626,000 and redirect the difference toward investment. (Id. ¶ 20.) Dike gave written approval for the change on October 25, 2012. (Id. ¶ 21.) Dike's reduction to his Policy's death benefit in fact did create an MEC, thereby subjecting the Policy returns to taxation. (Id. ¶ 25.) Dike learned of this fact on February 1, 2016, when he for the first time received a Form 1099r from PIA reporting "gain on MEC." (Id. ¶26.)

## II. Procedural Background

Dike filed suit against PIA on March 28, 2017 (ECF 1). He then filed an amended complaint on June 13, 2017 (ECF 8). On June 27, 2017 PIA filed a motion to dismiss all counts of the Amended Complaint (ECF 9). Dike responded on July 7, 2017 (ECF 10), and PIA replied on July 14, 2017 (ECF 11).

## III. Discussion

### A. Legal Standard

In considering a motion to dismiss under Rule 12(b)(6), "we accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." Warren Gen. Hosp. v. Amgen, Inc., 643 F.3d 77, 84 (3d Cir. 2011) (internal quotation and citations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

The Court in Iqbal explained that, although a court must accept as true all of the factual allegations contained in a complaint, that requirement does not apply to legal conclusions; therefore, pleadings must include factual allegations to support the legal claims asserted. Id. at

678, 684. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678 (citing Twombly, 550 U.S. at 555); see also Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008) ("We caution that without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests.") (citing Twombly, 550 U.S. at 556 n.3). Accordingly, to survive a motion to dismiss, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

### B. Analysis

#### i. Statute of Limitations

With regard to Dike's tort claims, Counts I-III, Texas law applies. There is no choice of law provision included in the Policy. Thus, in a diversity action, the Court applies the choice-of-law rules of the forum state, here, Pennsylvania. Klaxon v. Stentor Electric Mfg. Co., 313 U.S. 487 (1941). Pennsylvania employs a "flexible rule" which "permits analysis of the policies and interests underlying the particular issue before the court" and instructs courts to apply the law of the state "with the most interest in the problem." Hammersmith v. TIG Ins. Co., 480 F.3d 220, 227 (3d Cir. 2007) (quoting Griffith v. United Air Lines, Inc., 203 A.2d 796, 805–06 (Pa. 1964)). Here, Texas law properly applies. Plaintiff David Dike is a resident of Texas. Dike purchased the Policy in Texas, and the conversations between Dike and PIA's agent Talbot, which are central to the dispute here, apparently took place in Texas. (ECF 9, 10-11, n. 29.) Thus Texas is clearly the forum with a greater interest in this case. There is a two year statute of limitations for the negligence and negligent supervision claims. Tex. Civ. Prac. & Rem. Code § 16.003(a).

There is a four year statute of limitations for the fraud claim. Tex. Civ. Prac. & Rem. Code § 16.004.

Both the Texas Insurance Code and the Texas Deceptive Trade Practices Act impose two year statutes of limitations. Tex. Ins. Code § 541.162; Tex. Civ. Prac. & Rem. Code § 17.565

PIA argues that the claim accrued on October 25, 2012, the day that Dike gave written approval to lower the Policy's death benefit, which in turn created an MEC. As Dike did not file the original complaint in this case until March 28, 2017, PIA argues that his claims are time-barred. Dike responds that the discovery rule applies. He argues that the limitations period did not begin to run until February 1, 2016, which was the date when he first learned that an MEC had been created, based on receiving, for the first time, a Form 1099r stating as much. Thus, he argues that he was within the two and four year statutes of limitations for all of his claims when he filed suit on March 28, 2017.

The Texas "discovery rule" is "the legal principle which, when applicable, provides that limitations run from the date the plaintiff discovers or should have discovered, in the exercise of reasonable care and diligence, the nature of the injury." Willis v. Maverick, 760 S.W.2d 642, 644 (Sup Court Tex 1988). The discovery rule applies by statute to all claims brought under the Texas Insurance Code, and the DTPA. Tex. Ins. Code § 541.162(a)(2); Tex. Bus. & Com.Code § 17.565. Where it is not statutorily commanded, the discovery rule applies when two conditions are satisfied: "the nature of the injury must be inherently undiscoverable and [ ] the injury itself must be objectively verifiable." TIG Ins. Co. v. Aon Re, Inc., 521 F.3d 351, 358 (5th Cir. 2008) (internal quotation omitted). The applicability of the discovery rule is determined categorically, that is, it is a question of whether the type of injury at issue is discoverable through reasonable diligence, rather than an evaluation of the specific facts at hand. Id.

5

PIA concedes that Dike's injury is objectively verifiable, satisfying the first requirement. (Motion to Dismiss, ECF 9 at 15.) As to the second, the parties disagree whether Dike's injury was "inherently undiscoverable." The Texas Supreme Court and the Fifth Circuit have recognized that "[p]rofessional malpractice, such as erroneous tax advice, 'is inherently undiscoverable.'" TIG Ins. Co., 521 F.3d at 359 (quoting Murphy v. Campbell, 964 S.W.2d 265, 271 (Tex. 1997) ("'[T]he very reason to seek expert advice is that tax matters are often not within the average person's common knowledge.'"). Thus the Texas discovery rule is applicable to all of Dike's claims. Whether the accrual of his claims was in fact deferred under the rule is another question, however.

The language of the Policy is central to this analysis. The third page of the Policy, entitled "Policy Specifications," states:

> Section 7702A of the Internal Revenue Code of 1986 establishes a class of life insurance contracts designated as 'modified endowment contracts.' The rules relating to whether a policy will be treated as a modified endowment contract are extremely complex. Please consult a qualified tax advisor regarding your own personal situation.

(Def. Ex. A-1, Policy at 3.) This passage can be considered in the Court's review of the Motion to Dismiss, as it is "contained within [an] 'undisputedly authentic document' submitted as [an] exhibit by the defendant," and is a document "'integral to or explicitly relied upon in the complaint.'" Williamson v. Chubb Indem. Ins. Co., WL 760838, 1 (E.D.Pa 2012) (quoting In re Burlington Coat Factory Sec. Lit., 114 F.3d 1410, 1426 (3d Cir.1997)). The primary question is whether or not Dike can be said to have exercised "reasonable care and diligence" in light of his failure to consult an outside source with regard to the tax consequences of lowering the Policy's death benefit.

In light of PIA's explicit warning to Dike about the complexity of this issue and instruction that he should consult with a "qualified tax adviser regarding [his] own personal situation," there is no doubt that reasonable diligence would have required him to seek external advice on this particular issue. PIA plainly, and on the first page of substantive policy specifications, warned Dike of the complexity of the subject matter that he attributes his losses to, and essentially withdrew from any duty to prevent this particular type of loss. The Policy then encourages Dike to seek advice regarding the potential that the Policy would be considered an MEC. PIA at no point takes on responsibility to provide this type of consultation. To the contrary, the Policy is very clear from the outset that it is a difficult issue about which Dike must seek guidance. Under the Texas discovery rule, "[k]nowledge of facts, conditions, or circumstances that would cause a reasonable person to make inquiry leading to the discovery of the concealed cause of action is equivalent to knowledge of the cause of action for limitation purposes." Kizer v. Meyer, Lytton, Alen & Whitaker, Inc., 228 S.W.3d 384, 389 (Tex. App. 2007). Dike's receipt in 2016 of an IRS form noting the fact that the Policy constituted an MEC is not "discovery" by Dike of any "facts" that make Dike's claims timely. Dike was on notice of this possibility in 2010 and 2012.

The discovery rule therefore does not have the effect of delaying the accrual of Dike's claims from October 25, 2012, to February 1, 2016. The statute of limitations on all of Dike's claims began to run on October 25, 2012, when he approved the reduction in the Policy's death benefit. The limitations period on Dike's negligence claims and his Texas statutory law claims ran out on October 25, 2014, and the limitations period on his fraud claim ran out on October 25, 2016. By the time that Dike filed his Complaint, on March 28, 2017, the statute of limitations had run on all of his claims.

Though this Court finds that Dike's claims are time-barred, we find in the alternative that all of Dike's claims fail under the Motion to Dismiss standard. We therefore proceed through an analysis of the sufficiency of Dike's claims.

### i. Negligence (Count I)

Dike asserts that PIA owed him a duty of care in administering the Policy. He alleges that PIA breached that duty of care by misrepresenting to him that "reducing the Policy's death benefit was an appropriate investment consistent with [his] goals." (ECF 8, Am. Comp. ¶ 33.) Dike claims that he suffered a loss in excess of $300,000 as a result of this negligence. (Id. ¶ 34.) This number represents the losses associated with the tax consequences of Dike's Policy becoming an MEC, specifically, "a large portion of [Dike's] retirement income, a large amount of insurance for [Dike's] estate in the event of his death, and the long-term care benefits added as a rider to the Policy in 2014." (Id. ¶ 29.)

Texas law applies to Dike's tort claims, supra. PIA asserts that all of Dike's tort claims are barred by the Texas economic loss rule, which forecloses recovery of economic losses on a tort theory when those losses are the result of "a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy." Chapman Custom Homes, Inc., v. Dallas Plumbing Co., 445 S.W.3d 716, 718 (Tex. 2014). Courts should refer to "both the source of the defendant's duty to act (whether it arose solely out of the contract or from some common-law duty) and the nature of the remedy sought by the plaintiff" in order to determine whether the economic loss rule applies. Peterson Group, Inc. v. PLTQ Lotus Group, L.P., 417 S.W.3d 46, 62 (Tex. App. 2013) (internal quotation omitted).

Texas courts have applied the economic loss rule to negligent misrepresentation claims in particular. In order to sustain such a cause of action in this context, a plaintiff must "establish

8

that he suffered an injury that is distinct, separate, and independent from the economic losses recoverable under a breach of contract claim." Sterling Chems., Inc., 259 S.W.3d at 797 (citing D.S.A. Inc. v. Hillsboro Indep. Sch. Dist., 973 S.W.2d 662, 663–64 (Tex. 1998)).

Reference to the nature of the injury alleged clarifies that under Texas law, Dike has not properly made out a cognizable negligence claim. The losses that Dike seeks to recover—retirement income, life insurance, and long-term care benefits—were all included as payouts under the terms of the Policy. They are all pieces of the benefit of the bargain he entered into with PIA, and would all be specifically recoverable under a valid breach of contract claim. Dike has not identified an "independent injury" distinct from these losses.

Count I must be dismissed as it is time-barred, and in the alternative, because Dike has not stated a claim for which relief can be granted. Count I is dismissed with prejudice.

### i. Negligent Supervision (Count II)

In Count II, Dike asserts that PIA had a duty to supervise and control the conduct of Talbot and Stevens, and that it failed to implement appropriate procedures to do so effectively. (ECF 8, Am. Comp. ¶¶ 36-7.) He further claims that PIA knew or should have known of Talbot's and Stevens's negligent conduct. (Id. at ¶ 38.) In failing to take appropriate measures to detect and prevent this conduct PIA "was negligent in its control, supervision, and/or oversight of its agent Talbot and its employee Stevens." (Id. ¶¶ 39-40.) Once again, Dike asserts that he suffered losses in excess of $300,000, in the form of retirement income, life insurance, and long-term care benefits. PIA asserts that this claim is barred by the economic loss rule.

Once again, because Dike has identified injuries that are limited to those that would be recoverable under a breach of contract claim, his negligent supervision claim cannot proceed.

Count II is dismissed with prejudice as it is time-barred, and in the alternative, for failure to state a claim for which relief can be granted.

### i. Fraud (Count III)

Count III alleges that PIA, through its agent Talbot, represented to Dike that reducing the Policy's death benefit was an appropriate investment consistent with his goals, while knowing that one of his goals was to avoid negative tax consequences including the creation of an MEC. (Am. Comp. ¶ 43.) PIA knew this representation was false, and intended to mislead Dike into relying on it. (Id. ¶¶ 45-6.) Dike justifiably relied on PIA's misrepresentation, which was material to Dike's decision to reduce the death benefit. (Id. ¶ 44, 47.) Ultimately this caused him losses in excess of $300,000. (Id. ¶ 48.)

Dike's fraud claim alleges only one misrepresentation: that reducing the Policy's death benefit was an appropriate investment consistent with his goals, including avoiding creation of an MEC. This statement, however, does not constitute a factual representation. PIA at the very outset warned Dike that he would need to seek out qualified advice regarding whether, in his "own personal situation," his Policy would be treated as an MEC. Against this backdrop Talbot's alleged statement that the decision to lower the Policy's death benefit was consistent with Dike's goals can hardly be characterized as a factual representation, and certainly it cannot be said to have been put forth as a guarantee. The alleged statement was a generalized opinion about a complex topic that PIA admitted up front it lacked the expertise to advise Dike about. That is exactly why the Policy encouraged Dike to seek external advice on the matter, making clear that PIA's agents were not qualified to give such advice. Dike simply has not pleaded facts to state a cause of action for fraud.

Even presuming that Dike has properly stated facts amounting to fraud, this claim would be invalid under the economic loss rule, like his other two tort claims. Dike relies heavily on Peterson Group, Inc. v. PLTQ Lotus Group, L.P. in arguing that fraud claims are not subject to the economic loss rule. That case does not stand for that proposition, though. In Peterson the First Court of Appeals of Texas permitted a plaintiff to pursue a tort claim where "the alleged fraud injury did not arise from the contract" and the recovery sought was "for a category of damages that was distinctly different from the contract damages." Peterson Group, Inc. v. PLTQ Lotus Group, L.P., 417 S.W.3d 46, 62 (Tex. App. 2013). Thus while the court asserted that the economic loss rule "has not been extended to bar recovery for fraud or fraudulent inducement," it actually resolved the issue with a standard application of the economic loss rule, rather than by applying an exception to the rule. Id. at 62. Peterson does not establish an exemption for fraud claims from the economic loss rule.

Dike has not cited any injury resulting from the alleged fraud that is "distinctly different from the contract damages." Dike has not made out a fraud claim, and he certainly has not made out a fraud claim that can survive the economic loss rule under Texas law.

Count III is dismissed with prejudice, as it is time-barred, and for failure to state a claim upon which relief can be granted.

### i. Violations of the Texas Insurance Code (Count IV)

Count IV alleges violations of the Texas Insurance Code. First, Dike alleges that by stating that reducing the Policy's death benefit was an appropriate investment consistent with his goals, PIA violated the Texas Insurance Code in the following ways:

1. PIA misrepresented the terms of the Policy in violation of Texas Insurance Code § 541.051(1)(A);

2. PIA misrepresented the benefits or advantages promised by the Policy in violation of Texas Insurance Code § 541.051(1)(B);

3. PIA made untrue statements of material fact in violation of Texas Insurance Code § 541.061(1);

4. PIA failed to state a material fact necessary to make other statements not misleading, considering the circumstances under which the statements were made, in violation of Texas Insurance Code § 541.061(2);

5. PIA made a statement in a manner that would mislead a reasonably prudent person to a false conclusion of a material fact in violation of Texas Insurance Code § 541.061(3);

6. PIA made a material misstatement of law in violation of Texas Insurance Code § 541.061(4);

7. PIA failed to disclose a matter required by law to be disclosed in violation of Texas Insurance Code § 541.061(5);

(Am. Comp. ¶¶ 53-54.) As a result of these violations, Dike alleges that he suffered damages in excess of $300,000. (Id.) All of Dike's claims under Sections 541.051 and 541.061 are dismissed without prejudice, with leave to amend.

At issue is Talbot's alleged misrepresentation to Dike that reducing the Policy's death benefit was an appropriate investment consistent with his goals, including that it would not create an MEC. Under Texas law, insurance policy holders have a duty to read their policy, and are charged with knowledge of the basic substance of their policy. Roland v. Transamerica Life

Ins. Co., 570 F.Supp.2d 871, 881 (N.D. Tex. 2008). A policyholder who fails to read and comprehend the plain terms of her policy cannot sustain a misrepresentation claim on the basis that the substance was not disclosed or explained to her. Roland, 570 F.Supp.2d at 871. "[W]here a specific misrepresentation about policy terms is alleged, the insured's duty to read the policy will not preclude a misrepresentation claim." Stewart Information Services Corp. v. Great American Ins. Co., 997 F.Supp2d 650, 670 (S.D. Tex. 2014) (internal quotations omitted). Dike has not alleged a specific misrepresentation, though. As discussed above, he has alleged that Talbot offered his opinion about a complex topic, which PIA disclaimed any ability to properly advise Dike about. Dike has not alleged a specific misrepresentation about the benefits or advantages of the Policy, or the terms of the Policy. His claims under 541.051(1)(A) and (B) of the Texas Insurance Code must be dismissed. By the same reasoning, we conclude that Dike has failed to state claims under § 541.061(1)-(3) of the Texas Insurance Code.

Dike has not put forth any factual allegations at all to support his claims under Sections 541.061(4) and (5) of the Texas Insurance Code.

All of Dike's claims under the Texas Insurance Code are dismissed without prejudice, with leave to amend.

### i. Violations of the Texas Deceptive Trade Practices Act (Count V)

Count V alleges violations of the Texas Deceptive Trade Practices Act ("DTPA"). Dike asserts that he is a consumer as defined under § 17.45(4) of the DTPA, and that he purchased services from PIA. (Am. Comp. ¶ 57.) He alleges that in misrepresenting that reducing the Policy's death benefit was consistent with Dike's goals, including the avoidance of an MEC, PIA violated Section 17.46 of the DTPA in several ways:

13

1. PIA violated § 17.46(5) by representing that services have characteristics, uses, and benefits they did not have;

2. PIA violated § 17.46(7) by representing that services are of a particular standard, quality, or grade though they are of another;

3. PIA represented that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, in violation of § 17.456(12);

4. PIA violated § 17.46(24) by failing to disclose information concerning services which was known at the time of the transaction where such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed;

5. PIA violated the DTPA by engaging in unconscionable actions against Dike and breaching express warranties owed to Dike.

(Id. ¶¶ 58-59.) Dike alleges that PIA's DTPA violations caused him losses in excess of $300,000, and mental anguish.

Texas courts consider purchasers of insurance policies to be "consumers" within the meaning of the DTPA. Webb v. UnumProvident Corp., 507 F.Supp.2d 668 (W.D. Tex. 2005). However, Dike's allegation that Talbot's statement to him that lowering the Policy's death benefit was consistent with his goals falls under the "professional service" exemption laid out in the DTPA for "the providing of advice, judgment, opinion, or similar professional skill." Tex. Bus. & Com. Code § 17.49(c). While Section § 17.49(c)(1) provides a carve out to this exemption for "an express misrepresentation of a material fact," Dike has not alleged a factual misrepresentation, but only an opinion about what the IRS might or might not do. This type of

allegation is not actionable.  Dike has not cited any case under Texas law supporting the sufficiency of his allegations.

Dike's claims under Sections 17.46(5), (7), (12), and (24) of the DTPA, and his claim that PIA violated the DTPA by acting unconscionably or breaching express warranties, will be dismissed without prejudice, with leave to amend.

## IV.    Conclusion

Defendant's Motion will be granted with respect to all of Dike's claims.  Counts I-III will be dismissed with prejudice, as they are all time-barred, and in the alternative, they all fail to state claims for which relief can be granted.  Because this Court does not have prior experience respecting the Texas statutes, the Court will dismiss Counts IV and V without prejudice, with leave to amend, if Dike can allege any additional facts that would "plausibly" entitle him to relief, if proven at trial.

O:\Christina.2017\Dike v. Penn Insurance (17-1410)\17-1410_MTD Memorandum_Final Draft.docx